**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| TIMOTHY J. HARRIS, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 2019-0736-JTL |
| | ) | |
| MARY ELLEN HARRIS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION**

Date Submitted: November 9, 2022
Date Decided: January 19, 2023

Joel Friedlander, Christopher M. Foulds, David Hahn, FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware; *Counsel for Petitioner/Plaintiff Timothy J. Harris*.

S. Michael Sirkin, R. Garrett Rice, ROSS ARONSTAM & MORITZ LLP, Wilmington Delaware; Gregory Lomax, LAULETTA BIRNBAUM, Sewell, New Jersey; Jill Guldin, FISHER BROYLES, LLP, Princeton, New Jersey; *Counsel for Kristen C. Harris and Megan Harris Loewenberg*.

David A. Jenkins, Julie M. O'Dell, SMITH, KATZENSTEIN & JENKINS LLP; Wilmington, Delaware; *Counsel for Mary Ellen Harris*.

Steven L. Caponi, Matthew B. Goeller, Megan E. O'Connor, K&L GATES LLP, Wilmington, Delaware; *Counsel for Mary Ellen Harris, Paul Petigrow, and Michael Schwager*.

Kurt M. Heyman, Patricia L. Enerio, Gillian L. Andrews, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; *Counsel for Royce Management, Inc., Judith Lolli, and Charles Grinnell*.

John L. Reed, Ronald N. Brown, III, Peter H. Kyle, Kelly L. Freund, DLA PIPER LLP (US), Wilmington, Delaware; Neal J. Levitsky, E. Chaney Hall, FOX ROTHSCHILD LLP, Wilmington, Delaware; Emily A. Kaller, GREENBAUM, ROWE, SMITH & DAVIS LLP, Woodbridge, New Jersey; *Counsel for Harris FRC Corporation*.

William M. Kelleher, Phillip A. Giordano, Madeline Silverman, GORDON, FOURNARIS & MAMMARELLA, P.A., Wilmington, Delaware; *Counsel for The Mary Ellen Harris 2011 Grantor Retained Annuity Trust*.

**LASTER, V.C.**

Dr. Robert M. Harris, Sr. formed Harris FRC Corporation (the "Company").[1] He and his spouse, Mary Ellen Harris, originally owned all of its 1,000 shares as tenants by the entirety. They gifted 190 shares to their five children (the "Siblings"), and they set up two grantor retained annuity trusts (the "GRATs") to transfer another 490 shares to the Siblings in a tax-advantaged manner. Through these transactions, control over the family-owned entity would pass to the second generation.

In this action, three of the Siblings allege that in 2015, as Dr. Harris's health was failing, Mary Ellen and four of her close friends and advisors schemed to seize control of the Company. After securing control, they engaged in a series of self-dealing transactions that tunneled millions of dollars out of the Company. To perpetuate their control, Mary Ellen and her advisors found ways to negate the distribution of shares from the GRATs.

The plaintiffs have asserted claims for breach of fiduciary duty and aiding and abetting breaches of fiduciary duty against Mary Ellen and the advisors based on their self-dealing. They also challenge a merger that Mary Ellen and the advisors effectuated to move the Company from Delaware to New Jersey (the "Outbound Merger"). And they contend that Mary Ellen violated the trust agreement that governed her GRAT by paying far less than equivalent value to withdraw the 245 shares it held (the "Share Withdrawal"). The

---

[1] My standard practice is to identify individuals by their last name without honorifics. When individuals share the same last name, my standard practice is to shift to first names. Using first names is confusing because Dr. Robert M. Harris has a son with the same name. This decision therefore refers to the father as Dr. Harris. That reference is sadly confusing as well, because one of the plaintiffs is Dr. Timothy J. Harris. This decision refers to him as Tim Harris.

plaintiffs contend that the advisors tortiously interfered with the GRAT's trust instrument by helping Mary Ellen complete the Share Withdrawal.

Michael Schwager is one of the advisors. After Mary Ellen gained control of the Company, he began handling the Company's financial and accounting work. The plaintiffs allege that because of the Company's simplified operations, the bills for that work should run between $20,000 and $30,000 per year. Schwager has been paid $285,000 per year. As the only person performing financial and accounting work for the Company, Schwager has written the checks for the interested transactions that have tunneled funds to Mary Ellen and her associates. When preparing the Company's financial statements, Schwager has taken steps to hide the interested transactions. When preparing the Company's tax returns, he has deducted personal transfers as if they were bona fide business expenses.

Schwager has moved to dismiss the claims against him for lack of personal jurisdiction. A proper assertion of personal jurisdiction requires a valid method for serving process, and the assertion of jurisdiction must comply with the requirements of due process.

The plaintiffs seek to serve Schwager under Delaware's Officer Consent Statute. Schwager argues that he cannot be served under that statute because he never served in a formal officer position. Addressing an issue of first impression, this decision holds that the Officer Consent Statute can be used to serve process on a person who serves in the role of president, chief executive officer, chief operating officer, chief financial officer, chief legal officer, controller, treasurer, or chief accounting officer of the corporation, even if the person does not hold the formal officer position.

In this case, the court cannot yet determine whether Schwager is subject to service of process under the Officer Consent Statute. On the one hand, Schwager was the only person engaged in the financial and accounting function for the Company, and he was so deeply involved that one of the defendants referred to him colloquially as the Company's Chief Financial Officer. The plaintiffs also allege that he was paid far more than what a services provider would receive. On the other hand, Schwager did not accept a formal officer role, and he says that he operated at all times as a principal of a small accounting firm. Under the circumstances, the plaintiffs are entitled to take jurisdictional discovery. A decision on whether Schwager can be served under the Officer Consent Statute and whether the resulting exercise of personal jurisdiction would comply with due process is deferred until after jurisdictional discovery is complete.

The plaintiffs alternatively seek to serve Schwager under Delaware's Long-Arm Statute. They have identified Delaware-directed acts that could support service of process under that statute, including the Outbound Merger and the redomiciling of a trust in Delaware as part of the Share Withdrawal. The plaintiffs also have made allegations indicating that Schwager was sufficiently involved with those Delaware-directed acts to support service of process and a constitutionally proper exercise of personal jurisdiction. Nevertheless, the record remains too limited to rule on those issues. Instead, the plaintiffs are again entitled to jurisdictional discovery. A decision on whether Schwager can be served under the Long-Arm Statute and the constitutionality of exercising personal jurisdiction over him will await the completion of that effort.

Schwager has moved to dismiss the counts that name him as a defendant for failing to state claims on which relief can be granted. Because the absence of personal jurisdiction could render that motion moot, the court does not reach it. A decision on Schwager's Rule 12(b)(6) motion is deferred until the court determines whether personal jurisdiction over Schwager exists.

## I.     FACTUAL BACKGROUND

The facts are drawn from the plaintiffs' Verified Supplemental and Third Amended Complaint (the "Complaint") and the documents that it incorporates by reference.[2] At this procedural stage, the plaintiffs are entitled to have the court credit their allegations and draw all reasonable inferences in their favor. For purposes of evaluating whether a defendant is subject to the court's jurisdiction, "the court may go beyond the pleadings and look to affidavits and other discovery of record." *Chandler v. Ciccoricco*, 2003 WL 21040185, at *8 (Del. Ch. May 5, 2003). The factual recitation therefore incorporates matters drawn from the parties' submissions in connection with the motions to dismiss.

### A.     The Company

Before May 2016, the Company was a New Jersey corporation. From May 2016 until May 2019, the Company was a Delaware corporation. Since May 2019, the Company has been a New Jersey corporation. It is and always has been a family-held entity.

---

[2] Citations in the form "Ex. __" refer to documents attached to the Affidavit of Christopher M. Foulds, which collects certain documents that are incorporated by reference in the Complaint. Dkt. 467.

Currently, its only stockholders are Mary Ellen, the five Siblings, and various trusts created for their benefit. The plaintiffs in this action are three of the Siblings: Tim Harris, Kristen Harris, and Megan Harris Loewenberg. As discussed below, another Sibling previously sued Mary Ellen and the Company and reached a settlement.

Dr. Harris founded the Company after securing the patent rights for an epilepsy drug. He monetized the patent rights through a license agreement with a global biopharmaceutical company and formed the Company to hold the rights and receive royalty payments. That revenue stream historically amounted to approximately $100 million per year. The Company's only significant function was to collect and distribute the payments. In 2020, the Company sold its patent rights for $342 million in cash. The Company currently holds a pool of cash of around $120 million. It has no operating business.

The Company has issued 1,000 shares. Originally, Dr. Harris and Mary Ellen owned all of the shares jointly as tenants by the entirety. In 2002, they transferred 38 shares to each of the Siblings, resulting in each owning a 3.8% interest. In 2011, Dr. Harris and Mary Ellen each created a GRAT and funded it with 245 shares. The GRATs would expire on December 31, 2018, and the shares would be distributed to the Siblings. Through the combination of the 190 shares they received directly and the 490 shares distributed from the GRATs, the Siblings would receive a total of 680 shares, representing a controlling 68% interest in the Company.

## B.     Dr. Harris's Illness

In October 2013, Dr. Harris was diagnosed with an aggressive form of aphasia consistent with Alzheimer's disease. As Dr. Harris's health deteriorated, Judith Lolli

insinuated herself into Mary Ellen's financial life. Lolli and Mary Ellen are next-door neighbors in Holmdel, New Jersey. They also own adjacent beach houses in Point Pleasant, New Jersey. They are so close that Lolli appears to have spliced Mary Ellen's cable connection and run a cable to her own home. Phone logs show that Mary Ellen and Lolli text many times a day.

Lolli brought Mary Ellen into contact with her own friends and advisors. Paul Petigrow is a New Jersey lawyer who served as Lolli's personal counsel. Petigrow promptly became Mary Ellen's personal counsel as well. Charles Grinnell is a New Jersey lawyer and career prosecutor who investigated and prosecuted the gangland murder of Lolli's brother, then became her close friend. Schwager is Lolli's personal accountant and another close friend. Like the Complaint, this decision refers to Lolli, Petigrow, Grinnell, and Schwager collectively as the "Advisors."[3]

---

[3] The defendants object to this term as an example of improper group pleading, but that objection is not well taken. The term "Advisors" is sufficiently limited to make the allegations plain, and the plaintiffs properly use the term to refer to actions that they believe the Advisors took collectively. They include specific allegations against individual advisors when they intend to call out particular individuals. That is not improper. *See, e.g.*, *In re Pattern Energy Gp., Inc. S'holders Litig.*, 2021 WL 1812674, at *58 n.737 (Del. Ch. May 6, 2021) (finding that complaint "pled specific facts against Garland and Browne" included allegations about "the Special Committee," which was defined to include them); *see also In re WeWork Litig.*, 2020 WL 7343021, at *11 (Del. Ch. Dec. 14, 2020) ("Although group pleading is generally disfavored, the Complaint's use of the term 'SoftBank' to capture both SBG and Vision Fund was justified here given the close relationship between these entities pled in the Complaint."); *In re Am. Int'l Gp., Inc.*, 965 A.2d 763, 796 (Del. Ch. 2009) (rejecting challenge to use of term "D & O Defendants" that was defined to include five individuals), *aff'd sub nom. Tchrs.' Ret. Sys. of La. v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011).

## C.     The Takeover

With Dr. Harris's health declining, questions arose as to who would lead the Company. Mary Ellen had no experience or qualifications for the role. The eldest Sibling, Robert M. Harris, Jr., had worked at the Company since 2000, held the office of Vice President, and managed the relationship that generated the Company's royalty stream.

A power struggle ensued with Mary Ellen and the Advisors on the one side and Robert on the other. In April 2015, eighteen months after his Alzheimer's diagnosis, Dr. Harris purportedly acted by written consent to remove Robert from his position as an officer. The written consent added Mary Ellen to the board of directors (the "Board"), where Dr. Harris had been the sole director. The plaintiffs assert that Dr. Harris did not have the capacity to execute the written consent and that Lolli pulled the strings so that Mary Ellen gained control over the Company.

Immediately after the first consent, Dr. Harris and Mary Ellen executed a second consent that caused the Company to enter into "an agreement with Lolli in substantially the form submitted hereto." Compl. ¶ 32. The consent did not attach an agreement. In June 2015, Lolli and Mary Ellen executed an employment agreement which provided for Lolli's compensation to be determined at an unspecified future date. Petigrow drafted the agreement. The Company began paying Lolli $15,000 annually as an employee and providing her with benefits.

The Company retained Grinnell as a consultant at a rate of $110 per hour. Schwager took over as the Company's accountant. Petigrow began doing more legal work for the Company. The Advisors had gotten their noses inside the tent.

7

In late summer 2015, Lolli and Grinnell decided to form Royce Management, Inc. ("Royce") as a vehicle for providing management services to the Company. In October, the Company began paying Royce $208,000 a month or $2,496,000 per year. The Company and Royce subsequently entered into a management services agreement that paid Royce $208,334 per month, provided for an annual fee escalator of 3.5%, and renewed automatically every year. The Company and Royce have amended the management services agreement twice, each time making it more favorable to Royce. In addition to the monthly fee, Mary Ellen has approved large end-of-year bonuses for Royce. In total, Royce received over $20 million from the Company between October 2015 and December 2020.

Royce is a shell. It has no employees other than Lolli and Grinnell, and it has no other clients. It has no assets other than its contract with the Company. It operates out of the Company's offices. It exists solely to channel money to Lolli and Grinnell. It has no expenses other than their salaries, pension contributions, distributions, and two $1,000 per month luxury car leases.

**D.     Dr. Harris's GRAT**

To maintain control over the Company, Mary Ellen and the Advisors had to deal with the GRATs. If the GRATs distributed their 490 shares as planned, then control over the Company would pass to the Siblings.

Around the same time that the Company began paying Royce, Lolli served as a witness when Dr. Harris purportedly amended his GRAT and executed a codicil to his will. Petigrow oversaw the drafting of the documents. The principal consequence of the amendments was to redirect the 245 shares in Dr. Harris's GRAT from the Siblings to Dr.

8

Harris's marital trust. That trust benefits Mary Ellen, and she has a power of appointment over its corpus, enabling her to determine where the assets go when the trust terminates. The transaction reduced the number of Shares that the Siblings would receive from 680 to 435, below majority control.

The Advisors wanted a cooperative trustee to oversee Dr. Harris's GRAT and the marital trust, so Lolli and Grinnell turned to Dan Selcow, a wealth manager at First Republic Bank. Lolli and Grinnell had an existing relationship with Selcow, and he was a friend of Petigrow and Schwager. Initially, they brought some of the Harris' personal accounts to Selcow to manage. Eager for more business, Selcow arranged for First Republic Trust Company of Delaware LLC ("First Republic Delaware") to take over as trustee.

Mary Ellen and the Advisors also took control of the family's charity, the Golden Dome Foundation. Mary Ellen removed the Siblings from the board of the foundation and installed Schwager, Petigrow, and Grinnell. Mary Ellen viewed the foundation as a place to stash money for her future use, explaining that she could "put money in golden dome and i [sic] pay no taxes and if I ever need it I can take a salary." *Id.* ¶ 51.

## E.     The Idea For The Inbound Merger

It was apparent that Robert might bring litigation over his removal and the events at the Company. New Jersey recognizes a claim for minority stockholder oppression, and available remedies include orders dissolving the corporation or appointing a custodian or provisional directors. A stockholder oppression lawsuit threatened to deprive Mary Ellen and the Advisors of control.

9

Mary Ellen and the Advisors believed that Delaware law would be more protective of their activities, so they started working on a merger that would move the Company to Delaware (the "Inbound Merger"). As Mary Ellen colorfully put it, "I have to work out a billion things at the office to get things ready for Delaware. They have better laws regarding shit like bob is pulling and we have connections there." Ex. 1.

In November 2015, Petigrow drafted Dr. Harris's letter of resignation from the Board, which he purportedly signed on November 16, two years after his Alzheimer's diagnosis. His resignation left Mary Ellen as the sole director. Petigrow drafted a power of attorney in which Dr. Harris empowered Mary Ellen to act on his behalf. Dr. Harris purportedly signed it, and Lolli witnessed it. Petigrow also drafted two proxies that Mary Ellen could use to vote Dr. Harris's shares, one for Dr. Harris to sign and one for Mary Ellen to sign using her power of attorney.

In December 2015, Mary Ellen provided an initial set of approvals for the Inbound Merger. She also appointed herself President and began paying herself $5 million per year for serving in that role. She continued the payments until 2019, when she resigned after the filing of this litigation. She appointed a lawyer to succeed her and paid him 11.5% of what she paid herself.

On December 7, 2015, Petigrow and Mary Ellen formed a Delaware corporation for use in the Inbound Merger. Two weeks later, Robert had his attorney send a letter to the Company that formally threatened litigation.

That same month, Petigrow wrote to the Siblings to explain why the Company was moving to Delaware. He claimed that the move would generate tax benefits and that the

10

Inbound Merger "will have no effect on a shareholder who lives in New Jersey." Compl. ¶ 75. After that, Grinnell decided that the Company would not provide any more information to stockholders, using Robert's threat of a lawsuit as a pretext.

**F.      Value Extraction On A Larger Scale**

In 2016, Mary Ellen and the Advisors stepped up their extraction of value from the Company. That year also saw Robert follow through with his threat of litigation by filing an action in New Jersey state court.

In February 2016, Mary Ellen signed a written consent approving an employment agreement with Petigrow. It paid him $600,000 per year to serve as Vice President and General Counsel for the Company. Petigrow continued to run a solo law practice out of the Company's offices, using the Company's personnel and resources, and without paying rent. Given his full-time law practice, Petigrow worked only part-time and sporadically as General Counsel.

In March 2016, Lolli had a physician friend declare Dr. Harris incapacitated. Petigrow drafted the physician's certificate, which read: "I have concluded, that by reason of progressive mental deterioration, he has, as of the date hereof, become incapacitated to act rationally and prudently in financial matters." Ex. 4. The doctor who signed it has a longstanding relationship with Lolli and works at Bayshore Health Center, which later received a $10 million donation that was paid for by the Company and which supported

the creation of an emergency care center in Dr. Harris's name. Ex. 6.[4] Grinnell witnessed the certificate. Ex. 4.

That same month, Mary Ellen adopted a resolution in her capacity as sole director that paid Dr. Harris a bonus in the amount of $15 million. Given Dr. Harris's incapacitation, the $15 million bonus was a disguised distribution to Mary Ellen.

Schwager cashed in too. Given the Company's minimal operations, the services for its accounting and taxes should have cost $20,000 to $30,000 per year. The Company entered into an arrangement with Schwager under which the Company paid him simultaneously on two parallel schedules: (i) $12,500 a month for a total of $150,000 per year, and (ii) $25,000 quarterly for another $100,000 per year. He also received annual "Merry Christmas" bonuses of $35,000. Schwager thus raked in $285,000 per year, ten times what the Company should have been paying. Plus, at the Company's expense, Schwager provided tax and accounting services to Mary Ellen, the Advisors, and their entities, including for Royce.

On May 1, 2016, the Inbound Merger became effective, and the Company emerged as a Delaware corporation. Robert exercised dissenters' rights and pursued an appraisal proceeding in New Jersey state court.

Now firmly in control of the Company, and believing that they had protection under Delaware law, Mary Ellen and the Advisors used Company funds to pay for an array of

---

[4] As discussed below, the Golden Dome Foundation made the pledge, but Mary Ellen and the Advisors caused the Company to pay it.

12

personal expenses. Lolli, Petigrow, and Grinnell reviewed and approved the bills. Schwager paid them. Schwager also made the payments due to Royce. The payments covered:

- a NetJets membership;

- two luxury SUVs;

- hundreds of thousands of dollars in spending at Tiffany & Co.;

- a New York Giants suite;

- personal legal fees;

- personal accounting fees;

- personal meals;

- charges for EZ Pass tolls, gas, car washes, and limousines;

- employees and contractors who worked at a farm owned by Mary Ellen (through an entity); and

- numerous charges for the farm, including for garage doors, gas, disposal, portable toilets, farm equipment and supplies, fiber optic cable, veterinary bills, ATVs, a Vespa, trailers, flooring, capital improvements, and kitchen appliances.

On the Company's taxes, Schwager deducted the expenses as if they were business related. When Schwager prepared the Company's financial statements, he obscured the personal expenses and the payments Royce received.

## G.    The Transactions To Preserve Control

During the second half of 2018, Mary Ellen and the Advisors engaged in two transactions designed to preserve their control over the Company. The first was a settlement with Robert, who was continuing to pursue his lawsuits. Mary Ellen and the Advisors understood that if Robert prevailed in his stockholder oppression action, then they

13

could lose control. Just before Mary Ellen's deposition, she settled with Robert by having the Company pay him more than $20 million.

The second transaction was the Share Withdrawal. Mary Ellen's GRAT was still scheduled to expire on December 31, 2018, at which point 245 shares representing just under 25% of the Company's common stock would be distributed to the Siblings. Under the trust agreement governing the GRAT, Mary Ellen could withdraw assets if she provided the trust with "equivalent value." Compl. ¶ 95. The Advisors decided that Mary Ellen would withdraw the shares at a lowball price, thereby benefiting herself by preventing a block of shares from falling into potentially adverse hands while expropriating the difference between the lowball price and fair value.

To support a lowball price for the Share Withdrawal, Petigrow commissioned an appraisal of the Company from EisnerAmper LLP, a valuation firm. Schwager helped furnish the firm with information.

The appraisal valued the Company at $242,863,296. The plaintiffs have pointed to substantial flaws in the appraisal, including a facially questionable 20% company-specific risk premium that increased the discount rate from 13% to 33%. The 20% company-specific risk premium was based in large part on a pending application by generic pharmaceutical companies for certiorari to the Supreme Court of the United States. As of November 19, 2018, weeks before what should have been a December valuation date, the Supreme Court had denied certiorari. *See Accord Healthcare, Inc. v. UCB, Inc.*, 139 S. Ct. 574 (2018). After more questionable discounts, the report appraised the 245 shares at $52,677,000, or 21.7% of the value of the Company. The shares represented 24.5% of the

14

Company's capitalization, so on that basis alone, Mary Ellen was paying 88.5% of their value (21.7% divided by 24.5%) for a built in 11.5% discount. The underpricing was much greater because the Company itself was undervalued. Backing out the 20% company-specific risk premium increases the value of the Company to $325 million. A 24.5% share of that value is $79,625,000. Mary Ellen's valuation was 66.1% of that figure, meaning that Mary Ellen was getting a 33.9% discount.

With a lowball valuation in hand, the next step was to find a trustee who would go along with the Share Withdrawal. And with the expiration date of the GRAT rapidly approaching, Mary Ellen and the Advisors needed a trustee who would sign off quickly, before December 31, 2018.

The Advisors went back to First Republic Bank, where Selcow had benefitted from managing more of Mary Ellen's assets. Selcow secured the greenlight internally to have First Republic Delaware become the trustee. Selcow had a conflict of interest for purposes of the Share Withdrawal because his compensation depended on increasing assets under management for First Republic Bank and generating referral fees. The Advisors indicated that after the Share Withdrawal, Mary Ellen would divide the GRAT into five successor trusts, one for each Sibling, with Selcow managing the funds. By signing off on the Share Withdrawal, Selcow, First Republic Bank, and First Republic Delaware gained a new pool of $50 million to put in fee-generating assets. First Republic Delaware also had a conflict, because First Republic Bank loaned Mary Ellen the money for the Share Withdrawal. First Republic Bank thus had a buy-side interest in the same transaction where First Republic Delaware was supposedly evaluating the deal as a fiduciary for the seller.

Grinnell and Lolli pushed Petigrow to complete the Share Withdrawal quickly. Petigrow coordinated the legal documentation. Schwager worked on the financial side.

First Republic Delaware officially became trustee of Mary Ellen's GRAT on December 24, 2018. Within two days after being appointed a trustee, First Republic Delaware had approved the Share Withdrawal at the valuation set by Mary Ellen's appraiser. First Republic Delaware did not negotiate. First Republic Delaware claimed that it "conducted such due diligence as it determined advisable and has determined that the properties acquired and substituted by the Grantor are of equivalent value, and consents to the substitution of assets." Ex. 12 at 1.

In the same document in which it signed off on the Share Withdrawal, First Republic Delaware secured indemnification from Mary Ellen for any liability resulting from the Share Withdrawal. *Id.* at 2. Mary Ellen committed to "defend First Republic with the counsel of [Mary Ellen's] choice," First Republic Delaware agreed not to enter into a settlement without Mary Ellen's consent, and the two parties agreed to cooperate in any litigation. *Id.* When First Republic Delaware made and received those commitments, it was nominally adverse to Mary Ellen on the Share Withdrawal and obligated as trustee to sue Mary Ellen to protect the GRAT if the trust did not obtain equivalent value for the shares.

With the Share Withdrawal complete, Grinnell thanked the First Republic team for a "great job." Compl. ¶ 108. Grinnell wrote to Lolli: "CONGRATULATIONS!!!" *Id.*

Also in December 2018, the Golden Dome Foundation made two $5 million irrevocable pledges to Bayshore Medical Center, where the doctor worked who had declared Dr. Harris incompetent. One $5 million pledge had a seven-year term that

16

contemplated equal payments of approximately $715,000. The Company began paying the roughly $715,000 installments. The second $5 million pledge had no installment payments. After this litigation was filed, the Company paid the second pledge.

## H. Tim Harris Hires Counsel And Asks Questions.

The Siblings had heard rumblings about the Share Withdrawal. On February 14, 2019, Loewenberg asked the Advisors about a transaction involving Mary Ellen's GRAT. Over a month later, First Republic Delaware told Tim Harris that "Mary Ellen exercised her power to substitute the Harris FRC stock with cash." *Id.* ¶ 110. That same week, First Republic Bank was in discussion with the Advisors about moving the "Mary Ellen and the Harris FRC relationship from Schwab to First Republic." *Id.* ¶ 111.

On April 10, 2019, Tim Harris's counsel in this action attended the annual meeting as his proxy. Petigrow and Grinnell attended for the Company. Mary Ellen did not attend. Petigrow chaired the meeting. Grinnell refused to identify himself. Petigrow called for a vote for the election of Mary Ellen as the Company's sole director and exercised proxies from Mary Ellen and First Republic Delaware in favor of her election. The proxies represented a majority of the Company's voting power. After tallying the vote, he called the meeting to a close.

Before the meeting was adjourned, Tim Harris's counsel asked for a report on the business of the Company, then followed up with a series of specific questions. Petigrow and Grinnell failed to provide substantive answers on numerous topics. Grinnell repeatedly asserted that all stockholder questions needed to be put in writing.

## I.  The Outbound Merger

With Tim Harris having retained a Delaware lawyer whose questions had not been answered, the Advisors anticipated that a books-and-records demand would be coming. Immediately after the annual meeting, Mary Ellen and the Advisors started working on a plan for a merger that would take the Company out of Delaware and back into New Jersey (the "Outbound Merger"). Grinnell circulated a New Jersey Supreme Court decision which indicated that inspection rights could be limited to formal documents like financial statements, minutes, and a list of stockholders. The Company did not keep minutes, and Schwager prepared the Company's financial statements so that they did not reveal the many self-interested transactions or the payments to Royce. The Advisors thought the Outbound Merger could be used to prevent Tim Harris from obtaining information about what was going on at the Company. They also thought that the Outbound Merger would cut off the Siblings' standing to assert derivative claims regarding events predating the merger, as they have argued in this case. It therefore seemed that they could move the Company back to New Jersey without walking into the type of lawsuit for stockholder oppression that they originally moved to Delaware to evade. And if someone eventually threatened such a lawsuit, they could always move the Company again.

On May 6, 2019, Tim Harris sent the Company a written demand for documents under Section 220. On May 13, the Company refused to produce any documents, claiming the demand constituted "harassment." *Id.* ¶ 127.

18

The Outbound Merger became effective on May 17, 2019. Mary Ellen approved the Outbound Merger as a director, and Mary Ellen and First Republic Delaware executed written consents approving it as stockholders.

The notice provided scant information about the Outbound Merger. It did not include any information about the large payments going to Royce and to Schwager, the plentitude of personal expenses being paid for by the Company, or the numerous entities being run out of the Company's offices. Schwager prepared the financial statements that were distributed with the notice.

**J.      This Litigation**

The Outbound Merger stymied Tim Harris's attempt to use Section 220, but it opened up another informational avenue. Tim Harris sought appraisal for one share of Company common stock. In discovery, he requested the information that a books-and-records inspection would have generated. Discovery did not go smoothly, and the court has expended significant judicial resources addressing various discovery motions.

In July 2020, the Company agreed to sell its assets for $342 million in cash. That amount was $100 million more than the valuation of $242,863,296 that EisnerAmper placed on the Company for purposes of the Share Withdrawal. The amount is quite close to the figure of $325 million that results from backing out the facially implausible 20% company-specific risk premium that boosted the discount rate to 33%. Internally, First Republic Delaware noted the gulf between the two prices. First Republic Delaware then promptly signed off on the sale, without asking any questions.

19

In September 2021, Tim Harris filed an amended petition and complaint that added plenary claims for breach of fiduciary duty against Mary Ellen and claims for breach of fiduciary duty and aiding and abetting against the Advisors. In October, Kristen and Loewenberg joined the case as additional plaintiffs.

## K.    The Currently Operative Complaint

In March 2022, the plaintiffs filed the Complaint. It asserts claims against Mary Ellen, Schwager, Lolli, Grinnell, Royce, and Petigrow.

Count I of the Complaint asserts that Mary Ellen breached her fiduciary duties as President, sole director, and controlling stockholder of the Company. The Complaint groups the breaches into six broad categories:

- approving self-interested and unfair compensation and other personal payments to herself;

- using Company resources for personal gain, including by supporting her personal ventures and engaging in transactions to maintain her control;

- colluding with the Advisors by providing them with exorbitant compensation and benefits to pay them off for helping her engage in and cover up wrongdoing at the Company;

- sequestering distributions to oppress stockholders;

- engaging in the Inbound Merger and Outbound Merger; and

- verifying knowingly incomplete and misleading discovery responses.

This court issued a decision holding that the only theory currently at issue in Count I is a direct challenge to the Outbound Merger. *Harris v. Harris*, 2023 WL 115541, *2 (Del. Ch. Jan. 6, 2023) (the "Standing Decision"). The derivative claims that were originally the subject of Count I remain at issue, but as corporate assets to be valued in connection with

20

the challenge to the Outbound Merger, rather than as independent claims that could support relief in their own right.

Skipping for the moment over Count II, Count III asserts claims for breach of fiduciary duty against the Advisors in their capacity as officers and agents. The Complaint alleges that Petigrow is a *de jure* officer, having agreed to serve as General Counsel. The Complaint alleges that Schwager, Grinnell, and Lolli acted as *de facto* officers. The Complaint alleges in the alternative that all were senior managers and agents of the Company who owed fiduciary duties in those capacities. The substance of the claims for breach of fiduciary duty against the Advisors generally tracks the claims against Mary Ellen. The Standing Decision applies to this count, so the only theory currently at issue is a direct challenge to the Outbound Merger.

Count IV alleges in the alternative that to the extent the Advisors are not accountable for breaching their own duties as fiduciaries of the Company, both the Advisors and Royce have aided and abetted the breaches of fiduciary duty by Mary Ellen, Petigrow, and any other Advisor that is found to have owed fiduciary duties. The Standing Decision applies to this count as well, so the only theory currently at issue is a direct challenge to the Outbound Merger.

The other two counts address the Share Withdrawal. Count II of the Complaint asserts that Mary Ellen breached the trust instrument governing her GRAT by failing to pay reasonably equivalent value in the Share Withdrawal. Count V asserts that Petigrow, Schwager, Lolli, Grinnell, and Royce tortiously interfered with the trust instrument by assisting Mary Ellen with the Share Withdrawal.

21

Count VI is the claim for an appraisal.

The defendants moved for dismissal on a multitude of grounds. This decision addresses (i) Schwager's motion to dismiss Counts III, IV, and V on the theory that the court cannot exercise personal jurisdiction over him and (ii) his motion to dismiss Counts IV and V as failing to state a claim against him.

## II. THE RULE 12(B)(2) MOTION

Schwager maintains that that this court cannot exercise personal jurisdiction over him for purposes of Count III, IV, or V. "Generally, a plaintiff does not have the burden to plead in its complaint facts establishing a court's personal jurisdiction over defendant." *Benerofe v. Cha*, 1996 WL 535405, at *3 (Del. Ch. Sept. 12, 1996). However, "[w]hen a defendant moves to dismiss a complaint pursuant to Court of Chancery Rule 12(b)(2), the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the defendant." *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007).

The plaintiffs' burden in responding to a Rule 12(b)(2) motion is an evidentiary burden, not a pleading burden. *Hart Hldg. Co. Inc. v. Drexel Burnham Lambert Inc.*, 593 A.2d 535, 538 (Del. Ch. 1991) (Allen, C.). A verified complaint satisfies the requirements for an affidavit and provides an evidentiary basis on which the plaintiff can rely. *See Bruce E. M. v. Dorothea A. M.*, 455 A.2d 866, 869 (Del. 1983) ("A verified pleading may also be used as an affidavit if the facts stated therein are true to the party's own knowledge."); *accord Weber v. Kirchner*, 2003 WL 23190392, at *3 (Del. Ch. Dec. 31, 2003); *Taylor v. Jones*, 2002 WL 31926612, at *2 n.6 (Del.Ch. Dec.17, 2002).

When considering a Rule 12(b)(2) motion, the court is not limited to the allegations of the complaint and can consider evidentiary submissions provided by the parties.[5] If the court has not conducted an evidentiary hearing, then a plaintiff "need only make a *prima facie* showing, in the allegations of the complaint, of personal jurisdiction and the record is construed in the light most favorable to the plaintiff."[6] If the court takes that approach, then the jurisdictional question technically remains open until trial, when the plaintiff must prove the jurisdictional facts by a preponderance of the evidence.[7]

---

[5] *Sample v. Morgan (Sample II)*, 935 A.2d 1046, 1055–56 (Del. Ch. 2007) ("In considering a motion to dismiss for lack of personal jurisdiction under Court of Chancery Rule 12(b)(2), I am not limited to the pleadings. Rather, I am 'permitted to rely upon the pleadings, proxy statement, affidavits, and briefs of the parties in order to determine whether the defendants are subject to personal jurisdiction.'" (quoting *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 974 (Del. Ch. 2000)); *Ryan*, 935 A.2d at 265 ("In ruling on a Rule 12(b)(2) motion, the court may consider the pleadings, affidavits, and any discovery of record.").

[6] *Sprint Nextel Corp. v. iPCS, Inc.*, 2008 WL 2737409, at *5 (Del. Ch. July 14, 2008); *Sample II*, 935 A.2d at 1056 ("In evaluating the record [on a Rule 12(b)(2) motion], I must draw reasonable inferences in favor of the plaintiff."); *Ryan*, 935 A.2d at 265 ("If . . . no evidentiary hearing has been held, plaintiffs need only make a prima facie showing of personal jurisdiction and the record is construed in the light most favorable to the plaintiff." (footnotes and quotation marks omitted)).

[7] *Travelers Indem. Co. v. Calvert Fire Ins. Co.*, 798 F.2d 826, 831 (5th Cir. 1986) ("However, 'at any time when the plaintiff avoids a preliminary motion to dismiss by making a prima facie showing of jurisdictional facts, he must still prove the jurisdictional facts at trial by a preponderance of the evidence,' or, as otherwise stated, '[e]ventually, of course, the plaintiff must establish jurisdiction by a preponderance of the evidence, either at a pretrial evidentiary hearing or at a trial.'" (quoting *Data Disc, Inc. v. Sys. Tech. Assocs. Inc.*, 557 F.2d 1280, 1285 n.2 (9th Cir. 1977) and *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981))).

Under Delaware law, the exercise of personal jurisdiction has two requirements. *Matthew v. Fläkt Woods Gp. SA*, 56 A.3d 1023, 1027 (Del. 2012). First, the plaintiff must identify a valid method of serving process. Second, the exercise of personal jurisdiction must rest on sufficient minimum contacts between the defendant and Delaware such that the exercise of personal jurisdiction "does not offend traditional notions of fair play and substantial justice." *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

## A.      The Officer Consent Statute

The plaintiffs initially seek to serve Schwager under Delaware's Officer Consent Statute. The plaintiffs assert that Schwager acted as the Company's chief financial officer or chief accounting officer, rendering him subject to service under the Officer Consent Statute. Schwager responds that he cannot be served under the Officer Consent Statute because he never formally accepted a position as an officer.

The Officer Consent Statute provides for service of process on anyone who "accepts election or appointment as an officer of a corporation organized under the laws of this State, or who after such date serves in such capacity" for purposes of "all civil actions or proceedings brought in this State, by or on behalf of, or against such corporation, in which such officer is a necessary or proper party, or in any action or proceeding against such officer for violation of a duty in such capacity." 10 *Del. C.* § 3114(b). Section 3114(b) states that for purposes of the statute, "the word 'officer' means an officer of the corporation who" fits into one of three categories:

> (1) Is or was the president, chief executive officer, chief operating officer, chief financial officer, chief legal officer, controller, treasurer or chief

24

accounting officer of the corporation at any time during the course of conduct alleged in the action or proceeding to be wrongful;

(2) Is or was identified in the corporation's public filings with the United States Securities and Exchange Commission because such person is or was 1 of the most highly compensated executive officers of the corporation at any time during the course of conduct alleged in the action or proceeding to be wrongful; or

(3) Has, by written agreement with the corporation, consented to be identified as an officer for purposes of this section.

*Id.* (formatting added).

Section 3114(b) plainly extends to an individual who officially accepts a formal officer position (a "Formal Officer"). No Delaware decision has addressed whether Section 3114(b) reaches an individual who serves in an officer role and fulfills the functions of that role, but who has not officially accepted a formal officer position (an "Acting Officer").

Determining whether Section 3114(b) extends to an Acting Manager presents a question of statutory interpretation. When interpreting a statute, the court's task is to "ascertain and give effect to the intent of the legislature." *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.*, 492 A.2d 1242, 1246 (Del. 1985). "Where the statute is unambiguous," the court "must adhere to the plain meaning of the statutory language." *Hazout v. Tsang Mun Ting*, 134 A.3d 274, 286 (Del. 2016). To do so, a court starts with "the plain meaning of the words . . . ." *Rubick v. Sec. Instrument Corp.*, 766 A.2d 15, 18 (Del. 2000). A statute "must be read as a whole in a manner that will promote its purposes." *Id.*

Dictionary definitions serve as an important starting point when determining plain meaning,[8] and in many cases, reliance on dictionary definitions will be sufficient. But dictionary definitions are not the only possible source of plain meaning. Words appear in sentences, and "the meaning of sentences depends critically on context . . . ." *U.S. v. Costello*, 666 F.3d 1040, 1044 (7th Cir. 2012) (Posner, J.). The natural habitat of words is within a text; words appear in phrases, in sentences, and in paragraphs. Those smaller texts appear within still larger texts, such as statutes or contracts. When interpreting those texts, a court cannot read words in isolation; the court must construe the text as a whole.[9] Although dictionaries contribute significantly to the analysis, the definitions they offer do not reveal words in their natural habitat. In a symposium on statutory interpretation, one

---

[8] *See, e.g.*, *In re Solera Ins. Coverage Appeals*, 240 A.3d 1121, 1132 (Del. 2020) ("This Court often looks to dictionaries to ascertain a term's plain meaning."); *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006) ("Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract."); *USA Cable v. World Wrestling Fed'n Ent. Inc.*, 766 A.2d 462, 474 (Del. 2000) (explaining that a term generally should be "construed in accordance with its ordinary dictionary meaning").

[9] The holistic interpretation principle applies to contracts. *See E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985) ("In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein."); *accord GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012). It likewise applies to statutes. *See Oceanport Indus., Inc. v. Wilm. Stevedores, Inc.*, 636 A.2d 892, 900 (Del. 1994) ("The General Assembly passed the pertinent statutes as a whole and not in parts or sections. Consequently, each part or section should be read in light of every other part or section to produce an harmonious whole.").

distinguished jurist referred to dictionaries as "word museums,"[10] and another commentator called them "word zoos."[11]

The plain language of the Officer Consent Statute extends to anyone who "accepts election or appointment as an officer . . . , or who after [the effective date] date serves in such capacity." 10 *Del. C.* § 3114(b). The plaintiffs argue that the phrases "accepts election or appointment" and "or . . . serves in such capacity" mean different things, with the former referring to Formal Officers and the latter referring to Acting Officers. That reading comports with the dictionary definition of "serves," which Merriam-Webster's Dictionary defines as an intransitive verb to mean "to hold an office: discharge a duty or function."[12] Under this definition, a person who discharges the duty or function of an office serves in that office. The verb "serve" also carries a functional connotation in the sense of "to be of use" or "to prove adequate or satisfactory." *Id.* The plain meaning of "serves" would therefore extend to someone who fills a role and performs the duties of an office, without formally accepting the position.

---

[10] Frank H. Easterbrook, *Text, History, and Structure in Statutory Interpretation*, 17 Harv. J.L. & Pub. Pol'y 61, 67 (1994).

[11] A. Raymond Randolph, *Dictionaries, Plain Meaning, and Context in Statutory Interpretation*, 17 Harv. J.L. & Pub. Pol'y 71, 74 (1994).

[12] *Serve*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/serve (last visited Jan. 17, 2023). Black's Law Dictionary does not have an entry.

The competing reading interprets the reference to anyone "who after [the effective date] serves in such capacity" as having the more limited purpose of ensuring that when the Officer Consent Statute became effective, it immediately applied to everyone then serving as a Formal Officer, rather than only applying progressively as individuals accepted election or appointment as Formal Officers. That reading initially seems plausible, but upon further examination, it is both oddly limited and overinclusive. It is oddly limited because "serves in such a capacity" would play a role only during the transitional phase after Section 3114(b)'s enactment, before enough time had passed for all Formal Officers to have been elected or appointed. After that point, the term would be surplusage. It is overinclusive because if the term "serves in such capacity" covered anyone serving as a Formal Officer after the effective date, then that is all the General Assembly needed to say, and the reference to "accepts election or appointment" becomes surplusage.

"Words in a statute should not be construed as surplusage if there is a reasonable construction which will give them meaning, and courts must ascribe a purpose to the use of statutory language, if reasonably possible." *Oceanport*, 636 A.2d at 900 (internal citation omitted); *accord, e.g.*, *Dewey Beach Enters., Inc. v. Bd. of Adjustment of Town of Dewey Beach*, 1 A.3d 305, 307–08 (Del. 2010). A reading that interprets the reference to anyone "who after [the effective date] date serves in such capacity" as a legacy of the post-enactment implementation of the Officer Consent Statute generates surplusage and is therefore unreasonable. Reading the same phrase as referring to Acting Officers avoids surplusage. It is the only reasonable reading.

28

Other parts of the statute support reading the "serves in such capacity" language to reach Acting Officers. Section 3114(b)(1) identifies "the president, chief executive officer, chief operating officer, chief financial officer, chief legal officer, controller, treasurer or chief accounting officer of the corporation." Everyone agrees that those terms designate roles, not titles. The top executive at a company who uses the title "Grand Poobah" still is subject to service of process under Section 3114(b)(1) as the president or chief executive officer. A real-world example is Jack Dorsey of Block, Inc. who holds the title of "Chief Blockhead." He remains subject to service of process under Section 3114(b)(1). And when Elon Musk re-designated himself as "Chief Twit," he did not fall out of the ambit of Section 3114(b)(1).

Section 3114(b)(2) points in the same direction. The statutory specification of persons "identified in the corporation's public filings with the United States Securities and Exchange Commission because such person is or was 1 of the most highly compensated executive officers of the corporation" incorporates by reference Item 402 of Regulation S-K, which requires disclosure of the compensation of named executive officers in an issuer's Form 10-K. 17 C.F.R. § 229.402. The provision requires disclosure for each of the Company's "named executive officers," defined as those individuals falling into four categories. The first category encompasses "[a]ll individuals serving as the registrant's principal executive officer or acting in a similar capacity during the last completed fiscal year ('PEO'), regardless of compensation level." *Id.* § 229.402(a)(3)(i). The second category encompasses "[a]ll individuals serving as the registrant's principal financial officer or acting in a similar capacity during the last completed fiscal year ('PFO'),

29

regardless of compensation level." *Id.* § 229.402(a)(3)(ii). The last two categories identify

highly compensated "executive officers," which the SEC elsewhere defines as follows:

> The term executive officer, when used with reference to a registrant, means its president, any vice president of the registrant in charge of a principal business unit, division or function (such as sales, administration or finance), any other officer who performs a policy making function or any other person who performs similar policy making functions for the registrant. Executive officers of subsidiaries may be deemed executive officers of the registrant if they perform such policy making functions for the registrant.

*Id.* § 240.3b-7. In each case, the SEC regulations go beyond Formal Officer status. For the

principal executive officer and principal financial officer, the definitions extend to anyone

"acting in a similar capacity." For other executive officers, the definition extends to the

listed roles plus "any other officer who performs a policy making function or any other

person who performs similar policy making functions for the registrant."

To be sure, Section 3114(b)(2) only applies to publicly traded corporations.

Nevertheless, by incorporating the federal regulations by reference, that subsection extends

to Acting Officers. That in turn suggests that Section 3114(b) should interpreted

consistently and as a whole to reach Acting Officers.[13]

---

[13] A fair counterargument is that the SEC's regulations show how drafters can include additional language, such as "acting in a similar capacity" or "any other person who performs similar policy making functions," to provide more clearly that a provision extends to Acting Officers. Section 3114(b)(1) admittedly does not include similar language. If Section 3114(b)(1) were the only pertinent text, then that argument would have more heft. When interpreting the statute as a whole, the court also must consider the introductory language in Section 3114(b) about a person who "serves in such capacity," as well as the interrelationships among the provisions as a whole.

Section 3114(b)(3) reaches beyond Formal Officers by allowing Section 3114(b)(3) to cover any individual who "[h]as, by written agreement with the corporation, consented to be identified as an officer for purposes of this section." Under this subsection, election or appointment as a Formal Officer is not required, because an individual can simply agree to be treated as an officer for purposes of the section. This category appears designed to reach individuals deeper in the organization, such as the notorious armies of vice presidents at financial firms, where the officer title is used as a perquisite rather than as a sign of policy-making authority. *E.g.*, *Aleynikov v. Goldman Sachs Gp., Inc.*, 2016 WL 3763246, *4–8 (Del. Ch. July 13, 2016), *aff'd*, 155 A.3d 370 (Del. 2017).

There are other statutory provisions to account for as well. Section 142(a) of the Delaware General Corporation Law addresses corporate officers. It states:

> Every corporation organized under this chapter shall have such officers with such titles and duties as shall be stated in the bylaws or in a resolution of the board of directors which is not inconsistent with the bylaws and as may be necessary to enable it to sign instruments and stock certificates which comply with §§ 103(a)(2) and 158 of this title. One of the officers shall have the duty to record the proceedings of the meetings of the stockholders and directors in a book to be kept for that purpose. Any number of offices may be held by the same person unless the certificate of incorporation or bylaws otherwise provide.

8 *Del. C.* § 142(a). Section 142(b) further provides that "[o]fficers shall be chosen in such manner and shall hold their offices for such terms as are prescribed by the bylaws or determined by the board of directors or other governing body." *Id.* § 142(b). Section 142 thus contemplates that Formal Officers will receive some form of official empowerment by a duly authorized corporate organ. Generally, the empowering authority will be the

31

board or other governing body of the entity, but it could be another duly empowered individual or group, such as a more senior officer for a more junior position.

Section 142 plainly addresses individuals who serve as Formal Officers. It therefore provides some support for reading Section 3114(b) as only applying to Formal Officers, but it does not exclude the possibility that Section 3114(b) could encompass Acting Officers. Common law doctrines make clear that formality is not required for fiduciary status. For agency relationships, the Restatement (Third) of Agency provides that "[a]n agency relationship arises only when the elements stated in § 1.01 are present" and further that "[w]hether a relationship is characterized as agency in an agreement between parties . . . is not controlling."[14] Delaware recognizes the *de facto* director doctrine, under which persons can take on the roles of directors irrespective of a formal authorization. *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016, 1031 (Del. Ch. 2020). Delaware likewise recognizes the *de facto* officer doctrine. *See In re Walt Disney Co. Derivative Litig.*, 906

---

[14] Restatement (Third) of Agency § 1.02 (Am. L. Inst. 2006), Westlaw (database updated Oct. 2022); *see* William W. Bratton & Michael L. Wachter, *Bankers and Chancellors*, 93 Tex. L. Rev. 1, 31 (2014) (discussing the contractible and non-contractible aspects of an agency relationship). A principal can authorize an agent to engage in specific types of conduct that otherwise might breach the agent's duties, but the parties cannot determine by contract whether or not the fiduciary relationship exists. *See* Restatement (Third) of Agency, *supra*, at § 8.06(1)(b); Andrew F. Tuch, *Disclaiming Loyalty: M&A Advisors and Their Engagement Letters: In Response to William W. Bratton & Michael L. Wachter,* Bankers and Chancellors, 93 Tex. L. Rev. 211, 217 (2015); *see also, e.g., Ha-Lo Indus., Inc. v. Credit Suisse First Bos., Corp.*, 2005 WL 2592495, at *5–6 (N.D. Ill. Oct. 12, 2005) (denying a motion for summary judgment that argued that a clause in an engagement letter disclaiming a fiduciary duty between a bank and its M&A client prevented the bank from owing fiduciary duties to its client).

A.2d 27, 48 (Del. 2006). And for LLCs, there is the *de facto* manager doctrine. *See WaveDivision Hldgs., LLC v. Millennium Digit. Media Sys., L.L.C.*, 2010 WL 3706624, at *3 (Del. Ch. Sept. 17, 2010).

True, Delaware has applied a strict test when determining whether someone can be held liable as a *de facto* officer. One of the more thorough discussions of the concept appears in a decision from 1948:

> The term "de facto officer" may be defined as one who is in actual possession of an office under claim and color of election or appointment and is in the exercise of its functions and in discharge of its duties, although not authorized by law to act in the official capacity he assumes. According to the weight of authority, a person, who has been duly elected to an office and who continues to exercise its functions after his title has been ended, is a de facto officer. . . . [T]hree things are necessary to constitute such an officer: (1) The office must have a de jure existence or at least one recognized by law; (2) The claimant must be in actual possession thereof; and (3) his possession must be held under color of title or authority.

*State ex rel. James v. Deakyne*, 58 A.2d 129, 131 (Del. Super. Ct. 1948) (citations omitted). Relying on these authorities, Schwager argues that he cannot be a *de facto* officer because he was never in actual possession of an office under color of election or appointment.

In *Deakyne*, the question was whether the *de facto* officer could validly take action on behalf of a governmental entity, *id.* at 132–33, and virtually all of the cases involving *de facto* officers have involved governmental entities.[15] The principal exception is *Disney*, where the Court of Chancery held that Michael Ovitz did not owe any fiduciary duties until

---

[15] *See, e.g.*, *State ex rel. James v. Schorr*, 65 A.2d 810, 817 (Del. 1948); *Drob v. Nat'l Mem'l Park, Inc.*, 41 A.2d 589, 598 (Del. Ch. 1945); *Moon v. Moon Motor Car Co.*, 151 A. 298, 299 (Del. Ch. 1930) (Wolcott, C.).

he formally took office as President of The Walt Disney Corporation. On appeal, the plaintiffs argued for the first time that Ovitz could have faced liability for earlier actions as a *de facto* officer. *Disney*, 906 A.2d at 48 (noting that issue was not raised below). The Delaware Supreme Court held that even if the argument were considered, the plaintiffs failed to establish that Ovitz was a *de facto* officer under the same test used when the validity of corporate action was at issue. *Id.* The high court noted that Ovitz had not purported to assume the office of President until October 1, 1995, and that the trial court had found that all of his pre-October 1 activity was preparatory in nature. *Id.* at 48–49. The *Disney* case, therefore, involved both a Formal Officer position (the office of President), and a factual finding that before he formally assumed that position, Ovitz had not acted as an officer. *Id.* The *Disney* case did not involve the question of whether a person could be treated as a *de facto* officer for purposes of a claim for breach of fiduciary duty if the individual performed the functions of an officer at a time when no one else was performing the role. *Id.* And no case has addressed service of process under Section 3114(b).

The question at this stage is not whether Schwager might ultimately be held liable for breach of fiduciary duty as a *de facto* officer. The question is whether Schwager can be served with process under Section 3114(b). A showing sufficient to impose liability should be sufficient to support jurisdiction,[16] but it does not follow that the showing necessary to

---

[16] *See In re P3 Health Gp. Hldgs., LLC*, 285 A.3d 143, 156–57 (Del. Ch. Oct. 26, 2022) (holding that where complaint made allegations sufficient to state claim against acting manager, those allegations were sufficient to support jurisdiction over acting manager under consent-to-service provision).

impose liability is necessary to support jurisdiction. It is more logical that a court could exercise jurisdiction based on a somewhat lesser showing than what is required to impose liability. Otherwise, the determination regarding jurisdiction would be case-dispositive. The strictures of the *de facto* officer doctrine are therefore not dispositive for jurisdictional purposes.

Another source of insight is the comparison between Section 3114(b) and Section 18-109(b) of the Delaware Limited Liability Company Act, which authorizes service of process on (i) a person named formally as a manager of a limited liability company in, or designated as a manager of a limited liability company pursuant to, a limited liability company agreement or similar instrument (a "Formal Manager") and (ii) a person who, although not a Formal Manager, "participates materially in the management of the limited liability company" (an "Acting Manager"). 6 *Del. C.* § 18-109(b). In a series of decisions, this court has applied the plain meaning of Section 18-109(b) to authorize service of process on persons who participated materially in the management of a limited liability company, including both high-level officers such as presidents and general counsel[17] and individuals who did not hold formal positions.[18]

---

[17] *See In re P3 Health Gp. Hldgs., LLC*, 282 A.3d 1054, 1065 (Del. Ch. 2022) (general counsel); *Metro Storage Int'l LLC v. Harron*, 2019 WL 3282613, at *6 (Del. Ch. July 19, 2019) (president).

[18] *See P3 Health Gp.*, 285 A.3d at 153 (representative of controlling member); *Phillips v. Hove*, 2011 WL 4404034, at *22 (Del. Ch. Sept. 22, 2011) (individual who took over day-to-day operations of entity, assumed title of President, and later filed a bankruptcy petition on entity's behalf, but without any formal authority); *PT China LLC v. PT Korea LLC*, 2010 WL 761145, at *5 & n.25 (Del. Ch. Feb. 26, 2010) (individual who was

An important difference between the statutes is that the material participation standard in Section 18-109(b) sweeps more broadly than any language in Section 3114(b). Schwager argues that Section 3114(b) therefore must only encompass Formal Officers, but that does not follow. For the reasons previously explained, Sections 3114(b)(2) and (b)(3) reach Acting Officers, and Section 3114(b)(1) should be read *in pari materia* and in conjunction with the statutory language about "serv[ing] in such capacity" to reach Acting Officers. Section 3114(b)(1) remains narrower than Section 18-109(b) in that it only extends to an individual who acts as president, chief executive officer, chief operating officer, chief financial officer, chief legal officer, controller, treasurer, or chief accounting officer.[19] Both Section 3114(b)(1) and (b)(2) refer to a person who "is or was" within the statutory definition. Under Section 3114(b)(1), that means that for all intents and purposes, the person must be the president, chief executive officer, chief operating officer, chief financial officer, chief legal officer, controller, treasurer, or chief accounting officer. But the statute's narrower scope does not mean that it only reaches Formal Officers. Section 18-109(b) demonstrates that a consent-to-jurisdiction provision can extend beyond formal

responsible for developing investment opportunities for business and who was named as a principal of the business and a "key man" in a joint venture agreement).

[19] *Cf. Gantler v. Stephens*, 2008 WL 401124, *7 (Del. Ch. Feb. 14, 2008) (holding that Section 3114(b) could not support jurisdiction over individual who served as chief compliance officer and corporate secretary because those were not roles identified in Section 3114(b)(1) and neither Section 3114(b)(2) or (3) applied), *rev'd in part on other grounds*, 965 A.2d 695 (Del. 2009).

positions to reach individuals who meet statutory criteria. Section 3114(b)(1) accomplishes the same thing, but only for individuals who act in the specified roles.

Finally, both sides advance policy arguments, all of which are worthy of consideration. The plaintiffs point out that if Section 3114(b)(1) only extends to Formal Officers, then the statute can easily be rendered ineffective. A limitation to Formal Officers creates gaps in coverage that individuals could exploit to evade service of process, whether by inadvertence or design.

The Company exemplifies both problems. Starting with inadvertence, the Company is a small, family-held business. The Board consists solely of Mary Ellen, a septuagenarian without a college degree or meaningful business experience. The Company does not keep minutes. With a corporation like that, some officer appointments may fall through the cracks. If Section 3114(b) only encompasses Formal Officers, then inadvertent failures to follow corporate formalities would limit its reach.

There is also the problem of evasion by design. Through Royce, the Company paid Lolli and Grinnell $208,334 per month to provide management services to the Company, and the $2.5 million that they received annually (excluding bonuses) was more than four times what Petigrow received as Vice President and General Counsel. The management services agreement designated Lolli and Grinnell as key employees, while also specifying that they were not officers. That looks like an intentional effort to eat one's cake and still have it by getting compensated like officers while avoiding accountability as officers.

Building on a concern with evasion, the plaintiffs argue that a narrow interpretation of Section 3114(b) would be inconsistent with its original intent. In 2003, after the Enron

37

and WorldCom scandals in which corporate officers engaged in significant wrongdoing, two members of this court identified the Delaware courts' inability to exercise personal jurisdiction over top officers as "[a] practical problem . . . for Delaware's ability to hold key officers accountable . . . ." William B. Chandler III & Leo E. Strine, Jr., *The New Federalism of the American Corporate Governance System: Preliminary Reflections of Two Residents of One Small State*, 152 U. Pa. L. Rev. 953, 1003 (2003). They proposed "a key executive counterpart" to Delaware's director-consent statute in recognition of the fact that "several of the most prominent of the corporate scandals have involved (apparently) serious breaches of fiduciary duty by corporate officers and executives who were not directors." *Id.* They called for the amendment to reach "top executives" and to provide for jurisdiction over claims against those individuals "in their official capacities as an officer or employee." *Id.* The following year, the Council of the Corporate Law Section of the Delaware State Bar Association proposed what is now Section 3114(b), and the General Assembly adopted it. 74 Del. Laws ch. 83 (2003) (codified at 10 *Del. C.* § 3114(b)). The synopsis states simply, "This amendment enables Delaware courts to exercise personal jurisdiction over persons who accept election or appointment as officers of a Delaware corporation, or who serve in such capacity, for claims brought against them in their official capacity." *Id.*

The plaintiffs posit that it would surprise the proponents and enactors of Section 3114(b)(1) to learn that a top executive could avoid jurisdiction simply by declining to serve as a Formal Officer and instead agreeing to provide precisely the same services as a third party contractor. Enron and WorldCom were public companies, so if Andy Fastow

38

(CFO of Enron) or Scott Sullivan (CFO of WorldCom) had hit upon the idea of creating a

personal management company like Royce and providing their services solely under

contract, then the architects of Section 3114(b) would not be left grinding their teeth.

Fastow and Sullivan still would have fallen within Section 3114(b)(2), because that

subsection incorporates the SEC regulations by reference, and those regulations expressly

include Acting Officers. Not so with private company executives like Elizabeth Holmes

and Sunny Balwani of Theranos. If the technology of creating personal management

companies and providing services solely by contract swept through Silicon Valley like

stock-option backdating,[20] then a narrow reading of Section 3114(b)(1) would render the

Officer Consent Statute ineffective. It does seem likely that the drafters of Section 3114(b)

expected the statute to reach the individuals who perform the duties, fill the roles, and act

---

[20] Scholars have used stock option backdating to show that practices spread through network effects. *See* Aharon Mohliver, *How Misconduct Spreads: Auditor's Role in the Diffusion of Stock-option Backdating*, Admin. Sci. Q. 1, 11 (2018) (finding evidence of network effects in the spread of options backdating activity among auditors); Bert I. Huang, *Shallow Signals*, 126 Harv. L. Rev. 2227, 2242 & nn.39–40 (2013) (describing a "contagion" aspect of the options backdating scandal); John M. Bizjak, et al., *Option Backdating and Board Interlocks*, 22 Rev. Fin. Stud. 4821 (2006) (exploring the role of board interlocks in explaining the spread of option backdating). *See generally* Elizabeth Pollman, *Private Company Lies*, 109 Geo. L.J. 353, 386 (2020) (noting that fraudulent practices and the rationalization of fraud "seems to spread through business culture or competitive pressures"); Sarath Sanga, *Network Effects in Corporate Governance*, 63 J.L. & Econ. 1, 3 (2020) (using patterns of Delaware incorporation to demonstrate that network effects play a dominate role in generating trends in corporate governance); Todd Haugh, *The Power Few of Corporate Compliance*, 53 Ga. L. Rev. 129, 162–70, 180 n.75 (2018) (describing the role of network effects in normalizing criminal behavior and corporate compliance violations). A jurisdiction-evading contractual arrangement is easily copied, and with a judicial blessing, could spread rapidly.

in substance as the top executives at private companies, regardless of Formal Officer status. Acting Manager status under Section 3114(b)(1) provides the vehicle.

Schwager responds with a policy argument of his own. He contends with considerable force that it is unfair to spring jurisdiction in Delaware on a contractual service provider. He fears an apocalyptic aftermath in which unwitting service providers can be swept in by a functional interpretation of Section 3114(b), with partners at law firms who refer to themselves loosely as "outside general counsel" suddenly subjected to jurisdiction here under the Officer Consent Statute. He says that would have a chilling effect on Delaware corporations receiving services and potentially leave Delaware entities isolated and bereft of professional advice.

The answer is that facts always matter. In the vast majority of cases, an outside service provider faces no risk of being served using Section 3114(b), because a plaintiff will not be able to plead facts indicating that the outside service provider acted as an officer. Envision a law firm partner who describes himself loosely as "outside general counsel" for a corporation with an in-house general counsel. Even if the corporation lacks a more extensive legal department, there is obviously a chief legal officer who is subject to service under Section 3114(b)(1). Absent extraordinary facts, the argument for service on the law firm partner under the Officer Consent Statute should fail out of the gate.[21] In a situation

_____

[21] There are situations where corporations establish co-officer positions, and quick internet searches reveal announcements of co-CEOs, co-CFOs, and co-General Counsel. It is thus impossible to rule out completely the possibility that an individual could be served as an Acting Officer under Section 3114(b)(1) even in the presence of a Formal Officer,

40

where there is no in-house legal person and the outside lawyer is performing all of the functions of a chief legal officer, then then the calculus may be different. Responsibility and, if necessary, accountability should correspond to duties and actions, not formal titles.

Section 3114(b)(1) therefore extends to Acting Officers, but only when the individual actually fulfills the role of president, chief executive officer, chief operating officer, chief financial officer, chief legal officer, controller, treasurer, or chief accounting officer. And even then, Section 3114(b) only provides a method of serving process. The court still must hold that the exercise of personal jurisdiction is consistent with due process. That question involves "applying the established minimum contacts test from *International Shoe* and its progeny." *Hazout*, 134 A.3d at 278. The constitutional dimension of the personal jurisdiction analysis examines whether it would be fair to compel a defendant to litigate in the forum state. "The well-established point of departure is that certain minimum contacts must exist between a State and a nonresident defendant before that State can exercise personal jurisdiction over him." *Moore v. Little Giant Indus., Inc.*, 513 F. Supp. 1043, 1048 (D. Del. 1981) (internal quotation marks omitted), *aff'd*, 681 F.2d 807 (3d Cir. 1982). The question is whether a defendant has sufficient minimum contacts with Delaware such that "compelling [them] to defend [themselves] in the State would be consistent with the traditional notions of fair play and substantial justice[.]" *Waters v. Deutz Corp.*, 479 A.2d 273, 276 (Del. 1984) (internal quotation marks omitted).

---

but it seems highly unlikely. I personally think it would require an exceptional evidentiary showing.

The constitutional analysis can be fact intensive. Yes, a Formal Officer often has difficulty disputing the constitutional exercise of jurisdiction under Section 3114, *see, e.g.*, *Hazout*, 134 A.3d at 239, but some Formal Officers have succeeded. *See BAM Int'l, LLC v. MSBA Gp. Inc.*, 2021 WL 5905878, at *11 (Del. Ch. Dec. 14, 2021) (declining to exercise jurisdiction over Formal Officers who fell within the scope of Section 3114(b) because of insufficient minimum contacts); *Turf Nation, Inc. v. UBU Sports, Inc.*, 2017 WL 4535980, at *9 (Del. Super. Ct. Oct. 11, 2017) (same as to defendant who served as President and CEO of Delaware corporation). To the extent there is uncertainty about whether a person served as an Acting Officer, that person should be able to argue with greater force that the exercise of personal jurisdiction would violate constitutional norms.

The record is currently insufficient to determine whether Schwager acted as the Company's chief financial officer or chief accounting officer and whether exercising jurisdiction over Schwager would be consistent with due process. But the plaintiffs have pled sufficient facts to warrant jurisdictional discovery.

When a plaintiff has asserted a non-frivolous basis to believe that a defendant could be subject to the court's jurisdiction, the court can permit the plaintiff to take discovery directed to the jurisdictional issues. The facts necessary to demonstrate the existence of personal jurisdiction are often in the exclusive control of the defendant. *See Compagnie Des Bauxites de Guinee v. L'Union Atlantique S.A. d'Assurances*, 723 F.2d 357, 362 (3d Cir. 1983); *Surpitski v. Hughes-Keenan Corp.*, 362 F.2d 254, 255–56 (1st Cir.1966). "As a plaintiff does have an evidentiary burden, [it] may not be precluded from attempting to prove that a defendant is subject to the jurisdiction of the court, and may not ordinarily be

42

precluded from reasonable discovery in aid of mounting such proof." *Hart*, 593 A.2d at 539. "Only where the facts alleged in the complaint make any claim of personal jurisdiction over defendant frivolous, might the trial court, in the exercise of its discretionary control over the discovery process, preclude reasonable discovery in aid of establishing personal jurisdiction." *Id.* As long as the plaintiff has provided "some indication" that the particular defendant is amenable to suit, then jurisdictional discovery is appropriate. *Hansen v. Neumueller GmbH*, 163 F.R.D. 471, 475 (D. Del. 1995); *see Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n.13 (1977) ("[W]here issues arise as to jurisdiction or venue, discovery is available to ascertain the facts bearing on such issues.").

In this case, there are factors favoring a ruling that Schwager served as an Acting Officer. It is undisputed that Schwager was the only individual performing financial and accounting services for the Company. No one else had any involvement in those functions. Grinnell referred to Schwager as the Company's Chief Financial Officer. Schwager was also richly compensated to the tune of $285,000 per year, which the plaintiffs allege is more than ten times what the Company should have been paying an outside firm for financial and accounting services. Yet there are also countervailing factors, most notably that Schwager never took on a Formal Officer role and remained at all times a principal of Schwager & Associates LLC, later Schwager Valanzano PC, a small accounting firm.

The plaintiffs are entitled to jurisdictional discovery to explore whether Schwager served as an Acting Officer and whether the exercise of personal jurisdiction over him would be constitutional. The decision on whether the court can exercise personal jurisdiction over Schwager is deferred until after jurisdictional discovery.

43

**B.      The Long-Arm Statute**

The plaintiffs alternatively seek to serve Schwager under Delaware's Long-Arm

Statute. It provides:

> (c) As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent: (1) Transacts any business or performs any character of work or service in the State . . . .

10 *Del. C.* § 3104(c)(1). A person who has engaged in such an act has established "a legal

presence within the State" and "thereby submits to the jurisdiction of the Delaware courts."

*Id.* § 3104(b).

Section 3104 is a "single act" statute. *Eudaily v. Harmon*, 420 A.2d 1175, 1180

(Del. 1980). Therefore, a "single transaction is sufficient to [authorize service and] confer

jurisdiction where the claim is based on that transaction." *Crescent/Mach I*, 846 A.2d at

978 (cleaned up). The defendant need not engage in the act themselves; the Long-Arm

Statute recognizes that the forum-directed activity can be accomplished "through an

agent." 10 *Del. C.* § 3104(c). When defendants conspire to engage in tortious activity, then

the Delaware-directed act of any one of the co-conspirators can be attributed to the others

for purposes of jurisdiction under the Long-Arm Statute. *Istituto Bancario Italiano SpA v.

Hunter Eng'g Co.*, 449 A.2d 210, 222 (Del. 1982) ("[I]f the purposeful act or acts of one

conspirator are of a nature and quality that would subject the actor to the jurisdiction of the

court, all of the conspirators are subject to the jurisdiction of the court.").

Section 3104(c) is to be "broadly construed to confer jurisdiction to the maximum

extent possible under the Due Process Clause." *Hercules Inc. v. Leu Tr. & Banking*

44

*(Bahamas) Ltd.*, 611 A.2d 476, 480 (Del. 1992); *accord LaNuova D & B, S.p.A v. Bowe Co.*, 513 A.2d 764, 768 (Del. 1986).

> [T]rial courts must give a broad reading to the terms of the long-arm statute[] in order to effectuate the statute's intent to ensure that this state's court may exercise jurisdiction to the full limits permissible under the Due Process Clause. In other words, the Supreme Court has instructed that trial courts should permit service under § 3104 if the statutory language plausibly permits service, and rely upon a Due Process analysis to screen out uses of the statute that sweep too broadly.

*Sample II*, 935 A.2d at 1056 (footnotes omitted). That said, there must be a sufficient nexus between the jurisdictional act and the claims that the party is asserting. *LaNuova*, 513 A.2d at 768 (explaining that the transaction of business only supports jurisdiction "with respect to claims which have a nexus to the designated conduct.").

As this decision discussed previously, if a plaintiff has asserted a non-frivolous basis to think that a defendant could be subject to the court's jurisdiction, then the court can permit the plaintiff to take discovery directed at the jurisdictional issues. *See Hart*, 593 A.2d at 539. All that is required is "some indication" that the particular defendant is amenable to suit. *Hansen*, 163 F.R.D. at 475.

### 1. Personal Jurisdiction For Purposes Of Count V

Count V asserts that Schwager tortiously interfered with the instrument governing Mary Ellen's GRAT by assisting her with the Share Withdrawal. Count V offers a straightforward place to begin because this court has addressed several of the key issues relating to this count when (i) denying a motion that Petigrow made to dismiss Count V on the grounds that this court could not exercise personal jurisdiction over him and (ii) denying similar motions by Lolli and Grinnell. *See Harris v. Harris*, 2023 WL 193078

45

(Del. Ch. Jan. 16, 2023) ("Lolli and Grinnell Decision"); *Harris v. Harris*, --- A.3d ----, 2023 WL 165967 (Del. Ch. Jan. 12, 2023) (the "Petigrow Decision"). For Schwager, the plaintiffs have asserted a non-frivolous basis for personal jurisdiction, entitling them to jurisdictional discovery.

The first step in assessing whether personal jurisdiction exists is to identify a statutory basis for service of process. Proper service under the Long-Arm Statute requires a Delaware-directed act. In the Petigrow Decision, this court held that the act of moving the situs of Mary Ellen's GRAT to Delaware by appointing First Republic Delaware as the GRAT's trustee (the "GRAT Domestication") was a Delaware-directed act that was sufficient to support service of process under the Long-Arm Statute. This court also held that the domestication of the GRAT was sufficiently connected to the Share Withdrawal to support the exercise of personal jurisdiction for claims related to the Share Withdrawal. Petigrow Decision, 2023 WL 165967, at *20–21. The same reasoning and rulings apply to Schwager. The question is whether Schwager was sufficiently involved with the GRAT Domestication such that the Delaware-directed act can be attributed to him.

In this case, the Complaint pleads facts sufficient to provide a non-frivolous basis to think that Schwager played a sufficient role in the GRAT Domestication to support the exercise of jurisdiction. Under the conspiracy theory of jurisdiction, when defendants have acted together to engage in tortious activity, a Delaware-directed act can be attributed to all of the co-conspirators. Under that theory,

> a conspirator who is absent from the forum state is subject to the jurisdiction of the court, assuming he is properly served under state law, if the plaintiff can make a factual showing that: (1) a conspiracy to defraud existed; (2) the

46

defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.

*Istituto Bancario*, 449 A.2d at 225.

The first three *Istituto Bancario* elements speak to the requirements of Delaware's Long-Arm Statute. The third *Istituto Bancario* element—whether a "substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state"— corresponds to the statutory requirement that the defendant have transacted business or performed work in the State. The first and second *Istituto Bancario* elements—the existence of a conspiracy and the defendant's membership in it—provide grounds for imputing the jurisdiction-conferring act to the defendant under agency principles, because "conspirators are considered agents for jurisdictional purposes." *Hercules*, 611 A.2d at 481; *accord Carlton Invs. v. TLC Beatrice Int'l Hldgs., Inc.*, 1995 WL 694397, at *12 (Del. Ch. Nov. 21, 1995) (Allen, C.). It remains true that the conspiracy theory itself is not an independent basis for jurisdiction that alleviates the need to establish a statutory hook to support service under Section 3104. *Hercules*, 611 A.2d at 482 n.6. But the first, second, and third *Istituto Bancario* elements correspond sufficiently with the requirements of Section 3104 such that satisfying the former accomplishes the latter.

The first and second *Istituto Bancario* elements ask whether a conspiracy existed and whether the defendant was a member of the conspiracy. 449 A.2d at 225. Although *Istituto Bancario* literally speaks in terms of a "conspiracy to defraud," the principle is not

47

limited to that particular tort.[22] Count V pleads a different species of tort claim: tortious interference with contract.

A complaint will support an inference of a conspiracy when it pleads facts supporting (i) the existence of a confederation or combination of two or more persons; (ii) that an unlawful act was done in furtherance of the conspiracy; and (iii) that the conspirators caused actual damage to the plaintiff. *Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1036 (Del. Ch. 2006). The Complaint does not explicitly contain a claim for conspiracy, but that is not an impediment for purposes of analyzing personal jurisdiction, because a plaintiff does not have to plead the existence of personal jurisdiction in its complaint. *See Benerofe*, 1996 WL 535405, at *3.

The Complaint alleges that the four Advisors acted in combination to tortiously interfere with the trust instrument governing Mary Ellen's GRAT, thereby causing actual damage to the plaintiffs. The Complaint pleads specifically that the Advisors acted in

---

[22] *See id.* at 222–25 (describing underlying theory without fraud-based limitation); *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 635–36 (Del. Ch. 2013) (noting that theory encompasses claims of breach of fiduciary duty and aiding and abetting), *abrogated on other grounds by El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1264 (Del. 2016); *In re Tilray, Inc. Reorganization Litig.*, 2021 WL 2199123, at *19 (Del. Ch. June 1, 2021) (noting that "[t]his court has recognized that a breach of fiduciary duty . . . and that control group theories[]like aiding and abetting claims" can supply a proper tort for the conspiracy theory of jurisdiction); *Perry v. Neupert*, 2019 WL 719000, at *24 (Del. Ch. Feb. 15, 2019) (noting that theory encompasses claims of conversion); *Hamilton P'rs v. Englard*, 11 A.3d 1180, 1197 (Del. Ch. 2010) (noting that theory encompasses claims of breach of fiduciary duty and aiding and abetting); *Crescent/Mach I*, 846 A.2d at 977 (rejecting construction of *Istituto Bancario* that would require a "specific allegation that [the defendants] agreed to conspire 'to defraud' minority stockholders").

concert to engage in the GRAT Domestication. According to the Complaint, "[o]n December 24, 2018, the Advisors caused the removal of Premier Trust as the Mary Ellen GRAT trustee and installed First Republic." Compl. ¶ 105. Schwager is one of the Advisors.

The Complaint specifically pleads facts which provide a non-frivolous basis to think that Schwager was an active member of the conspiracy. The Complaint alleges that he provided information to EisnerAmper to support the lowball valuation that the firm generated. *Id.* ¶ 96. He also worked to marshal the funds for the Share Withdrawal, which suggests that he also helped to secure the loan from First Republic Bank that Mary Ellen used to fund the transaction. *See id.* ¶ 104. Schwager also had close ties with Selcow and First Republic Bank that were likely instrumental in convincing First Republic Delaware to become the trustee of the GRAT and permit the Share Withdrawal to go forward on an expedited basis. For example, Selcow told Grinnell that "Mary Ellen's relationship with me and First Republic would not be possible without you, Judy [Lolli], Mike [Schwager] and Paul [Petigrow]." *Id.* ¶ 227. Selcow told his colleagues that he was "very close to Judy [Lolli], [her husband] Victor, Chuck [Grinnell] and Mike Schwager." *Id.*

When evaluating Schwager's involvement, the magnitude of the payments he received from the Company is pertinent. The Complaint alleges that because the Company's business was so straightforward, the fees for the accounting and tax services it needed should have run between $20,000 and $30,000 per year. Schwager received $285,000 per year. It is reasonable to infer that he was paid to further the personal interests of Mary Ellen and the other Advisors.

Schwager's broader involvement with Mary Ellen and the other Advisors is also a factor. Schwager moved his offices into a suite (Suite 303) adjoining the Company's headquarters (Suite 304). After removing the Siblings from the board of the Golden Dome Foundation, Mary Ellen installed Schwager, Petigrow, and Grinnell as her co-trustees. Mary Ellen also made Schwager and Petigrow her co-trustees on the board of the Cardinal Acres Foundation, which is new foundation that Mary Ellen and the Advisors established after Tim Harris began asking questions about the Golden Dome Foundation. *See id.* ¶ 220.

Whether these allegations could support the exercise of personal jurisdiction is a close question. Unlike Grinnell and Lolli, the record lacks evidence of spoliation by Schwager that would support drawing an adverse inference at this stage of the case, so that factor is not available to tip the scales. *Cf.* Lolli and Grinnell Decision, 2023 WL 193078, at *19–21. Yet the allegations are more than adequate to support jurisdictional discovery. The plaintiffs have not had the opportunity to conduct any discovery regarding Schwager's involvement in the GRAT Domestication or the Share Withdrawal. The plaintiffs have leave to explore these issues, both for purposes of evaluating whether service of process can be accomplished under the Long-Arm Statute and for purposes of assessing whether there are sufficient minimum contacts to support the constitutional exercise of personal jurisdiction.

## 2. Personal Jurisdiction For Purposes Of Counts III and IV

In Count III, the Complaint asserts that Schwager breached his fiduciary duties by (i) pursuing the personal best interests of Mary Ellen and the Advisors rather than the best interests of the Company and all of its stockholders and (ii) pursuing his own best interests

50

rather than the best interests of the Company. In Count IV, the Complaint asserts that to the extent that Schwager was not himself a fiduciary, he aided and abetted those defendants who were fiduciaries in breaching their duties. After the Standing Decision, these counts have been narrowed to a direct challenge to the Outbound Merger.

The Standing Decision affects the analysis of Counts III and IV under the Long-Arm Statute. It is no longer necessary to examine the ongoing course of conduct that pre-dated and post-dated the Outbound Merger to determine whether the alleged wrongdoing bears a sufficient connection to Delaware to support personal jurisdiction. What matters is whether the court can assert personal jurisdiction over Schwager for purposes of the challenge to the Outbound Merger.

Once again, analysis of personal jurisdiction starts with the Long-Arm Statute and the need for a Delaware-directed act. The Outbound Merger is itself a Delaware-directed act that constitutes the transaction of business in Delaware for purposes of claims relating to that act. *See Kahn v. Lynch Commc'n Sys., Inc.*, 1989 WL 99800, at \*4 (Del. Ch. Aug. 24, 1989). And once again, the question is whether Schwager was sufficiently involved in the Outbound Merger to attribute that act to him for jurisdictional purposes.

To reiterate, the conspiracy theory of jurisdiction attributes a Delaware-directed act to a defendant when a conspiracy to engage in tortious conduct existed and the defendant was a member of the conspiracy. *Istituto Bancario*, 449 A.2d at 225. The allegations of the Complaint provide a non-frivolous basis to infer that the Advisors engaged in a conspiracy to harm the plaintiffs by engaging in the Outbound Merger and that Schwager was a member of the conspiracy.

Count III pleads a claim for breach of fiduciary duty against Mary Ellen and the Advisors. A claim for breach of fiduciary duty is an equitable tort. *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 840 (Del. Ch. 2022). As noted, a complaint will support an inference of a conspiracy when it pleads facts supporting (i) the existence of a confederation or combination of two or more persons; (ii) that an unlawful act was done in furtherance of the conspiracy; and (iii) that the conspirators caused actual damage to the plaintiff. *Allied Cap.*, 910 A.2d at 1036. When a complaint alleges that fiduciaries acted in concert to commit a breach of duty, those allegations satisfy the requirements to plead a conspiracy to engage in tortious conduct involving those fiduciaries. Again, the absence of an explicit conspiracy claim is not fatal for jurisdictional purposes. *See Benerofe*, 1996 WL 535405, at *3. If the court concludes that Schwager is a fiduciary, then the conspiracy theory supports jurisdiction over him for purposes of Count III.

Count IV pleads a claim for aiding and abetting breaches of fiduciary duty against any of the Advisors who are not found to be fiduciaries. "[I]n cases involving the internal affairs of corporations, aiding and abetting claims represent a context-specific application of civil conspiracy law." *Allied Cap.*, 910 A.2d at 1038; *accord Weinberger v. Rio Grande Indus., Inc.*, 519 A.2d 116, 131 (Del. Ch. 1986). Sufficiently pleading that a defendant aided and abetted a breach of fiduciary duty satisfies the need to plead a conspiracy to engage in tortious conduct involving that defendant. *Virtus Cap. L.P. v. Eastman Chem. Co.*, 2015 WL 580553, at *12 (Del. Ch. Feb. 11, 2015). If the court concludes that Schwager is not a fiduciary, then the conspiracy theory supports jurisdiction over him for purposes of Count IV.

52

In this case, the Complaint pleads facts sufficient to provide a non-frivolous basis to infer that Schwager was part of a conspiracy to harm the plaintiffs by engaging in the Outbound Merger. The Complaint alleges that Schwager worked with the other Advisors to prepare the merger documentation. Compl. ¶ 130. The Complaint points to entries on the Company's privilege log which identify Schwager communicating with Grinnell and Petigrow about the Outbound Merger. *Id.* The Complaint also alleges that Schwager did all of the accounting for the Company and prepared its financial statements. The Complaint alleges that Schwager prepared the financial statements in a manner that concealed the self-dealing payments that Mary Ellen and the Advisors received, as well as the many personal and non-business-related expenses that the Company was paying. *Id.* ¶ 132. The Company provided the financial statements that Schwager prepared to stockholders in connection with the Outbound Merger. There is a non-frivolous basis to infer that Schwager manipulated the financial statements so that stockholders would not have reason to seek appraisal in connection with the Outbound Merger.

As with Count V, the magnitude of the payments that Schwager received from the Company is a pertinent factor, as are his other ties to Mary Ellen and the Advisors. It is reasonable to infer that Schwager was paid excessive amounts to further the personal interests of Mary Ellen and the other Advisors and that he went along as part of the team.

As with Count V, whether these contacts could support personal jurisdiction over Schwager presents a close question. The allegations nevertheless provide grounds to conduct jurisdictional discovery. The plaintiffs have leave to explore the connections between Schwager and the Outbound Merger both for purposes of evaluating whether he

can be served under the Long-Arm Statute and to assess whether the extent of his contacts with Delaware are sufficient to make the exercise of personal jurisdiction consistent with due process.

## III. THE RULE 12(B)(6) MOTION

Schwager separately contends under Rule 12(b)(6) that Counts III, IV, and V of the Complaint do not state a claim against him. A party does not have a right to a pleading-stage ruling at the start of a case. *See Spencer v. Malik*, 2021 WL 719862, at *5 (Del. Ch. Feb. 23, 2021); *see also Pattern Energy Gp.*, 2021 WL 1812674, at *46 & n.612. Rule 12(a)(1) allows a court to defer the decision of a pleading-stage motion until a later point in the case. Ct. Ch. R. 12(a)(1) ("If the Court denies the motion or postpones its disposition until the trial on the merits, the responsive pleadings shall be served within 10 days after notice of the Court's action."); *Slingshot Techs., LLC v. Acacia Rsch. Corp.*, 2021 WL 1224828, at *3 (Del. Ch. Mar. 30, 2021) ("Under Rule 12(a)(1), a court may postpone the disposition of a pleading[-]stage motion until a later stage of the case, including until the trial on the merits."). Rule 12(d) reiterates this point, noting that a court should address a Rule 12(b)(6) motion in a preliminary hearing "unless the court orders that the hearing and determination thereof be deferred until the trial." Ct. Ch. R. 12(d).

More generally, "Delaware trial courts have inherent power to control their dockets," *Solow v. Aspect Res., LLC*, 46 A.3d 1074, 1075 (Del. 2012), and that authority includes determining how to proceed for the "orderly adjudication of claims." *Unbound P'rs Ltd. P'ship v. Invoy Hldgs. Inc.*, 251 A.3d 1016, 1030 (Del. Super. Ct. 2021) (cleaned up). Rule 1 instructs the members of this court that the rules "shall be construed,

54

administered, and employed by the Court and the parties, to secure the just, speedy and inexpensive determination of every proceeding." Ct. Ch. R. 1. Commenting on the sibling federal rule, a leading treatise states that "[t]here probably is no provision in the federal rules that is more important than this mandate. It reflects the spirit in which the rules were conceived and written, and in which they should be interpreted." 4 Charles Alan Wright, Arthur R. Miller & Adam N. Steinman, *Federal Practice and Procedure* § 1029 (4th ed.), Westlaw (database updated Apr. 2022). Court of Chancery Rule 16(a) similarly contemplates that a court may take steps to "formulat[e] and simplif[y] . . . the issues" and to address "[s]uch other matters as may aid in the disposition of the action." *Id.* 16(a)(1), (5). The same authoritative treatise explains that "case management [is] an express goal of pretrial procedure." 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1521 (3d ed.), Westlaw (database updated Apr. 2022). To that end, the Advisory Committee's note to the federal rule emphasizes the need for "a process of judicial management that embraces the entire pretrial phase." Fed. R. Civ. P. 16 advisory committee's note to 1983 amendment. The commentary recognizes that "[t]he timing of any attempt at issue formulation is a matter of judicial discretion." *Id.*

The manner of proceeding that is most likely to secure the just, speedy, and inexpensive determination of this proceeding is to defer consideration of the Rule 12(b)(6) motion until after the court has ruled on the Rule 12(b)(2) motion. If this court cannot exercise personal jurisdiction over Schwager, then it will not be necessary to reach the Rule 12(b)(6) issues.

## IV.   CONCLUSION

The plaintiffs can conduct jurisdictional discovery into whether Schwager can be served under the Officer Consent Statute or the Long-Arm Statute and into whether the exercise of jurisdiction would be consistent with due process. The scope of discovery will address the services that Schwager provided to the Company and his involvement with the GRAT Domestication, the Share Withdrawal, and the Outbound Merger. The court will defer considering Schwager's motion to dismiss under Rule 12(b)(6) until after the court has ruled on the Rule 12(b)(2) motion.